IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JINENDRA JINADASA, | ) | CIVIL NO. 14-00441 SOM/KJM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING WITH RESPECT |
| | ) | TO RACE DISCRIMINATION CLAIMS |
| vs. | ) | AND DENYING MOTION FOR |
| | ) | PARTIAL SUMMARY JUDGMENT AS |
| BRIGHAM YOUNG UNIVERSITY- | ) | MOOT WITH RESPECT TO |
| HAWAII, et al., | ) | WITHDRAWN SEX DISCRIMINATION |
| | ) | CLAIM; ORDER DENYING |
| Defendants. | ) | PLAINTIFF JINENDRA JINADASA'S |
| _____ | ) | MOTION FOR SUMMARY JUDGMENT |

**ORDER GRANTING WITH RESPECT TO RACE DISCRIMINATION CLAIMS AND
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT WITH RESPECT
TO WITHDRAWN SEX DISCRIMINATION CLAIM; ORDER DENYING PLAINTIFF
JINENDRA JINADASA'S MOTION FOR SUMMARY JUDGMENT**

I.        INTRODUCTION.

In the papers he has filed in this case, Plaintiff
Jinendra Jinadasa, proceeding pro se, projects himself as a
person with the best of intentions who seeks to right the wrongs
he says minority employees suffer while employed by
Defendant Brigham Young University-Hawaii ("BYU Hawaii").
Jinadasa is not proceeding as a class representative and so may
not seek remedies on behalf of others.  He may only seek remedies
for harm he has personally suffered, which in theory may include
harm suffered as he tried to protect others from unlawful
discrimination.

This court's order of January 25, 2016, left for
adjudication the following claims: (1) Jinadasa's Title VII,
Title IX, and § 1981 disparate treatment claims based on the
allegations that Mindy Clark was paid more and disciplined less

than Jinadasa, as asserted in Counts I, III, and IV of the Fourth Amended Complaint; and (2) Jinadasa's retaliation claim under Title VII, asserted in Count II of the Fourth Amended Complaint.

Both BYU Hawaii and Jinadasa seek summary judgment with respect to the remaining claims.  At the hearing, Jinadasa withdrew with prejudice his gender-based discrimination claims. Accordingly, the court denies as moot BYU-Hawaii's motions to the extent they seek partial summary judgment with respect to the gender discrimination claims.  The court grants BYU-Hawaii summary judgment with respect to the remaining claims and denies Jinadasa's motion.

**II.     SUMMARY JUDGMENT STANDARD.**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position concerning whether a material fact is genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not

rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial.  T.W. Elec. Serv., 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial."  Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  Id.  When "direct evidence"

4

produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  Id.

**III.      BACKGROUND.**

On April 24, 2007, BYU-Hawaii hired Jinadasa as a Web Architect.  See Decl. of Kevin Schlag ¶ 5, ECF No. 132-1, PageID # 1538; Videotaped Depo. of Jinendra Jinadasa at 46, ECF No. 132-5, PageID # 1563.  Kevin Schlag, who was Jinadasa's supervisor at BYU-Hawaii, offered Jinadasa the position with a starting salary of $44,000 per year, which Jinadasa accepted.  Id. at 46-47, PageID #s 1563-64.

Jinadasa has previously told this court that he is black and from Ethiopia, Africa.  See ECF No. 44, PageID # 331; ECF No. 61, PageID # 517; see also Transcript of Proceedings, Jan. 11, 2016, at 23, ECF No. 111, PageID # 1126.  Jinadasa says he found a pay stub for a Caucasian Portal Administrator, Mindy Clark, who was paid $5,954.17 per month, or $71,450.04 per year. See ECF No. 115-1, PageID # 1245.  Jinadasa says that he had more relevant work experience and a more difficult job with greater responsibilities.  He argues that the difference in pay must therefore have been based on his race.  See ECF No. 115, PageID #s 1230-31.  Jinadasa contends that he was also discriminated against based on his race when he was suspended for having

5

violated BYU-Hawaii's Honor Code.  According to Jinadasa, Clark was not suspended for her Honor Code violations.  See ECF No. 115, PageID # 1227.

BYU-Hawaii's differing treatment of Jinadasa and Clark lies at the heart of this case.  The court examines the factual detail as necessary in the discussion below.

IV.     ANALYSIS.

> A.     **Because Jinadasa Has Withdrawn His Gender Discrimination Claims With Prejudice, the Court Denies as Moot BYU-Hawaii's Motion With Respect to the Gender Discrimination Claims.**

BYU-Hawaii sought partial summary with respect to Jinadasa's remaining disparate treatment gender discrimination claims.  See ECF No. 120.  At the hearing on the motion, Jinadasa withdrew his gender discrimination claims with prejudice.  Given that withdrawal, the court denies as moot BYU-Hawaii's motion to the extent it seeks partial summary judgment with respect to the gender discrimination claims.

> B.     **The Court Grants Partial Summary Judgment In Favor of BYU-Hawaii With Respect to Jinadasa's Remaining Disparate Treatment Race Discrimination Claims, Which Are Based on Pay and Discipline Differences Between Mindy Clark and Jinadasa.**

BYU-Hawaii also seeks  partial summary judgment with respect to Jinadasa's disparate treatment race-based claims asserted under Title VII and 42 U.S.C. § 1981.  That motion is granted.

6

In relevant part, § 1981 prohibits race discrimination in the making and enforcement of contracts.  Title VII similarly prohibits discrimination based on race, color, religion, sex, or national origin:

> (a)  It shall be an unlawful employment practice for an employer --
>
> > (1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

A plaintiff may establish disparate treatment in violation of § 1981 or Title VII through direct evidence or, alternatively, through the familiar McDonnell Douglas burden shifting framework.  See Surrell v. California Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (discussing standard with respect to Title VII and § 1981 claims).  Jinadasa lacks direct evidence of disparate treatment.  The court therefore applies the McDonnell Douglas framework to these motions for summary judgment.

The framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), begins by requiring a plaintiff to establish a prima facie case of discrimination.  The degree of proof required to establish a prima facie case for summary

judgment is minimal.  See Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005).  A prima facie case of disparate treatment requires a plaintiff to establish that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position in issue; (3) the plaintiff suffered an adverse employment decision; and (4) one or more employees outside the protected class with comparable qualifications and work records did not suffer similar adverse employment decisions. See, e.g., White v. Pac. Media Grp., Inc., 322 F. Supp. 2d 1101, 1110 (D. Haw. 2004).

A plaintiff must demonstrate that his or her situation is similar in all material respects to that of employees who received more favorable treatment.  See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006).  However, "a plaintiff is not obligated to show disparate treatment of an *identically* situated employee." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (cited approvingly in Selig).  Instead, "individuals are similarly situated when they have similar jobs and display similar conduct."  Hawn v. Exec. Jet Mgmt. Inc., 615 F.3d 1151, 1160 (9th Cir. 2010) (citing Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) (finding employee not similarly situated if he "did not engage in problematic conduct of comparable seriousness" to plaintiff's conduct)).

Under the McDonnell Douglas framework, once a plaintiff succeeds in presenting a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision.  Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).  "Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination."  Id.

1.    **Jinadasa's Disparate Treatment Claims Based on Unequal Pay Fail Because He and Mindy Clark Were Not Similarly Situated.**

In asserting disparate treatment in the form of unequal pay, Jinadasa points to Mindy Clark's salary, which was higher than his.  But Jinadasa presents no evidence suggesting that he and Clark were similarly situated.  Jinadasa therefore fails to show that there is any genuine issue of fact going to whether he has a prima facie case of disparate treatment relating to pay.

According to Eugenia Soliai, the Assistant Director & Equal Opportunity Manager at BYU-Hawaii, BYU-Hawaii's Human Resources Department establishes the salary ranges for administrative and staff positions at BYU-Hawaii.  See Decl. of Eugenia Soliai ¶ 1-2, ECF No. 132-2, PageID # 1549.  The Human Resources Department sets the salary grade according to "the scope of responsibilities assigned with the job and the amount of discretion and independent judgment required to be exercised by

an employee in that position." Id. ¶ 3, PageID # 1550.  The

Human Resources Department also makes starting salary

recommendations based on the position's salary grade and an

individual's work experience and education.  In making that

recommendation, the Human Resources Department does not consider

student employment to be work experience.  Id. ¶¶ 4-5.

According to his resume, Jinadasa has a Bachelor of

Science degree in International Business Management with a minor

in Information Technology.  ECF No. 115-12, PageID # 1279.

Jinadasa was hired as a Web Architect, which, even before

Jinadasa had applied for that position, the Human Resources

Department had designated as having a salary grade of "52."  See

Decl. of Kevin Schlag ¶ 5, ECF No. 132-1, PageID # 1538; Decl. of

Kevin Schlag ¶ 6, ECF No. 144-2, PageID # 1909.

When Schlag hired Jinadasa, the Human Resources

Department recommended that Jinadasa's starting salary be

$44,300.  See Schlag Decl. ¶ 7, ECF No. 132-1, PageID # 1538.

Schlag says that, at the time he hired Jinadasa, he did not think

Jinadasa had "much relevant, real world experience."  Id. ¶ 8.

Jinadasa had done a little web design and development, but most

of his experience related to repairing computers and networks.

Id.  His duties included the following:

> [being] responsible for supporting department
> web pages, developing graphics and layouts
> for the website, transferring web pages into
> the new Drupal system (a content management

> system), testing and analyzing traffic on the
> website, providing website training to
> department staff, and helping department
> staff with special website requests.
> Jinadasa also spent a large amount of his
> time helping departments to maintain website
> content, which included changing pictures and
> text.

Id. ¶ 9, PageID # 1539.

According to her resume, Clark had a Bachelor's degree

in Computer Information Systems.  ECF No. 115-11, PageID # 1276.

Schlag says:

> Clark was the primary administrator for the
> PeopleSoft portal.  PeopleSoft was a system
> that housed sensitive personnel and student
> data, such as accounting records, social
> security numbers, contact information,
> payroll, financial aid, and grades.  As the
> Portal Administrator, Clark was responsible
> for, among other things, maintaining and
> securing the PeopleSoft system, customizing
> PeopleSoft for the needs of BYUH's faculty,
> staff, and students, and troubleshooting
> technical and user issues.

Id. ¶ 12, PageID #s 1539-40.  BYU-Hawaii's Human Resources

Department set the salary grade for the Portal Administrator

position at "53."  Schlag says that "the Portal Administrator

position was more complex than the Web Architect position because

PeopleSoft requires a deeper level of technical understanding.  A

Web Architect uses well-developed tools and standards to make web

pages.  A Portal Administrator, on the other hand, needs to use

tools that are harder to use, and the required skills are less

prevalent in the labor marketplace."  Id. ¶ 13, PageID # 1540.

Schlag also viewed Clark's college degree as more relevant to her position than Jinadasa's degree was to his. Id. ¶ 17, PageID # 1541.

Jinadasa and Clark had different jobs with different responsibilities. On the present record, they cannot be said to have been similarly situated. Even if Jinadasa could be said to have been a better employee with more responsibilities than Clark, and even if his Web Architect position could be deemed more important than Clark's Portal Administrator position, that would not support a prima facie case of disparate treatment of similarly situated employees. BYU-Hawaii was allowed to pay different amounts to employees in different positions even if someone else might have equated certain job duties or backgrounds. BYU-Hawaii's determination of what it chose to value does not, absent more, show discrimination against employees based on race. Notably, the lower job classification that resulted in the lower salary for the Web Architect position was set before Jinadasa had even applied for the job. This court therefore looks at whether Jinadasa has more than the differing valuations to support his claim of unequal pay based on race.

At the hearing on the present motions, Jinadasa referred to having submitted a chart to the court indicating that 75% of BYU-Hawaii's employees are white. It appears that Jinadasa was referring to Exhibit H to his motion for summary

judgment, which indicates that BYU-Hawaii's administration has 33 white employees and 9 minority employees.  <u>See</u> ECF No. 115-8, PageID # 1264.  Even assuming Jinadasa presents admissible evidence as to the racial make up of the administration, that make up does not support the disparate treatment claim Jinadasa is advancing with respect to his pay.  Jinadasa is claiming that he was treated differently from a similarly situated employee of a different race.  Jinadasa does not even argue that he and the bulk of BYU-Hawaii's primarily white administration were similarly situated.  Jinadasa therefore cannot simply point to a statistic as evidence that he was paid less than a similarly situated employee of a different race.

Jinadasa also mentioned at the hearing that there was a pay disparity between Caucasian and non-Caucasian employees at BYU-Hawaii.  But Jinadasa provided the court with no evidence to that effect.  Under Local Rule 56.1(f), this court has no "duty to search and consider any part of the court record not otherwise referenced in the separate and concise statements of the parties."  A mere assertion of a general pay disparity is insufficient to raise a genuine issue of fact as to whether Jinadasa was paid less than any similarly situated employee because of his race.

>           **2.    Jindasa's Disparate Treatment Claims Based on
>                  Unequal Discipline Fail Because He Raises No
>                  Genuine Issue of Fact As to Whether the
>                  Discipline Related to Comparable Conduct.**

Jinadasa was suspended for 5 days in October 2012,
3 days with pay and 2 days without pay. <u>See</u> Decl. of Norman
Black. ¶ 4, ECF No. 132-2, PageID # 1545. The Fourth Amended
Complaint alleges that the suspension was based on alleged
violations of the university's Honor Code. <u>See</u> Fourth Amended
Complaint ¶ 31, ECF No. 61, PageID # 524. It further alleges
that "Caucasians and others who had committed more serious
offenses were never disciplined." <u>Id.</u> Jinadasa specifically
alleges that Mindy Clark, who was allegedly a similarly situated
female Caucasian employee, violated the Honor Code and used
profanity but was not subjected to any discipline. <u>Id.</u> ¶ 24,
PageID # 522. BYU-Hawaii seeks partial summary judgment with
respect to this unequal discipline claim. The court grants that
request, as Jinadasa fails to demonstrate that Clark was a
similarly situated person who received lesser discipline.

On or about November 5, 2008, Jinadasa sent his
supervisor, Kevin Schlag, an e-mail in which he complained that
Mindy Clark had referred to President Obama as "satan." <u>See</u>
Decl. of Kevin Schlag ¶ 22, ECF No. 132-1, PageID # 1542. Schag
counseled Clark, telling her that her coworkers believed that the
comment was offensive. On November 6, 2008, Clark sent an
apology to Schlag, stating, "I wanted to apologize for some

14

comments I made the day after the election.  They were not meant to hurt and it was disrespectful of me.  Please accept my apologies."  ECF No. 132-7, PageID # 1749.

On or about December 31, 2009, Jinadasa sent Schlag another e-mail complaining that Clark was stressed at work and used the word "shit." See Decl. of Kevin Schlag ¶ 23, ECF No. 132-1, PageID # 1542.  Schlag says he again counseled Clark. Clark apologized for her language.  Id.

Jinadasa's suspension arose out of a series of statements he made that BYU-Hawaii deemed insubordinate, irreverent, unprofessional, and increasingly hostile.  Schlag, who supervised both Clark and Jinadasa, reacted by counseling Jinadasa "as to his rude, unprofessional, disrespectful, and insubordinate communications."  See Decl. of Kevin Schlag ¶ 25, ECF No. 132-1, PageID # 1542.

Jinadasa's behavior spanned a long period.  On February 5, 2010, for example, Jinadasa sent Schlag an e-mail complaining that Schlag had not consulted Jinadasa about a particular decision, accusing Schlag of having ignored Jinadasa's plea for 2 student workers, stating that Jinadasa was annoyed by Schlag's e-mail concerning a web policy, and saying that Jinadasa did not appreciate Schlag's e-mails asking Jinadasa to "improve relations."  See ECF No. 132-5, PageID #s 1713-14.  Schlag

responded, "I'll give you a bit of time to cool off, but I'd like to address this sooner rather than later." Id., PageID # 1713.

On June 9, 2010, Jinadasa received an e-mail that asked how a new software would interface with Drupal. See ECF No. 132-5, PageID # 1711. Jinadasa responded, "We heard rumors but were never involved in anything or were asked to research and see the integration process." Id. Schlag then sent an e-mail to Jinadasa stating, "You must have missed a meeting, when we talked about this in our dept meeting a while ago." Id., PageID # 1710. Jinadasa replied,

> Yes we talked about it. Is there not a process where the actual web people test the product and are given a chance to see what the product can do before it is purchased or implemented?
>
> This is kind of force spoon feeding the web team to go a long with a product they have no clue about and were left in the dark about. Whose bright idea was this?

Id.

It appears that, on August 25, 2011, Jinadasa told BYU-Hawaii's Human Resources Department that he was asserting discrimination claims. ECF No. 132-5, PageID #s 1727 (letter from Human Resources Department indicating that Jinadasa had initiated internal "claims" with that department on August 25, 2011). Jinadasa followed this with further unhappy e-mails. For example, on October 4, 2011, Jinadasa sent Tessie Faustino, Eugenia Lawrence, and Gloria Gervacio (all with BYU-Hawaii's

16

Human Resources Department), along with Schlag, an e-mail concerning a charge of discrimination that he was planning to file with the Equal Employment Opportunity Commission.  The e-mail stated, "How ignorant and reckless could you and the administration be?"  ECF No. 144-9, PageID # 2055.  He then stated, "P.S.  Feel free to hack my email account and copy my hard drive, nothing to hide.  Just don't put anything in there that should not be there because I have auditing and login notifications.  Thanks."  ECF No. 144-10, PageID # 2057. Jinadasa then filed his EEOC charge on October 5, 2011.  See ECF No. 121-3.

On October 10, 2011, Jinadasa sent another e-mail to Faustino, Lawrence, Gervacio, and Schlag, stating, "Hi!  I hope Dave Thomas has advised you on the possible outcomes that may result from the investigation of the EEOC and this class action lawsuit.  As a courtesy, I would advise Norm Black not to get too comfortable."  ECF No. 144-11, PageID # 2058.

On October 19, 2011, Jinadasa sent an e-mail to Faustino, Lawrence, and Schlag that complained about Schlag's "berat[ing] my communication skills because I never kiss up to him and the rest of the administration."  ECF No. 144-12, PageID # 2059.

17

On October 26, 2011, Jinadasa sent Faustino, Lawrence, Gervacio, and Schlag the following e-mail regarding Schlag's evaluation of Jinadasa:

Hi! Boss:

This is to let you know that I do not agree with your evaluation ratings and find your ratings without merit and they are not based on a methodical matrix. Your evaluations since the time I have questioned your management decisions have been repeatedly lower than what I have evaluated myself based on the projects and objectives I have set and completed.

Too bad HR does not provide Performance evaluations for Directors, anyway since you are leaving EIS here is some final thoughts. Unlike your so called "project management stuff" that you have been working on since 2009 and which we have yet to see to this day; I have projects and email, server logs of what I have done and feedback from the departments I have worked with. You have no right in lowering my ratings, because you are hardly at the office and never take the time or initiative to see what projects we are working on, the only time you are ever involved in a project is if it is a high profile or we request your intervention on something, and during our one time monthly one on one. You lack the ability to motivate and empower a team, and most importantly the ability to give technical vision. You rely too much on email communication and coop yourself up in your office, spend too much time on Facebook tweeting about the '80's during work and lack face time with your employees (except a select few).

Lastly Boss, next time you interview someone for a temple recommend and ask them if they are honest with their fellow men, you ask yourself if you were honest with me and my family when you offered me $44,300. I wonder

18

what the conversation was like with Jim
Nilson and the rest of your boys club-hi bud
guess what I got JJ to agree to $44K cause he
is coming from Kiribati where he was making
10 times less than that and he has no idea he
is getting a lower pay than all our IT staff
that graduated in 2005,-that is going to make
our department look good and I am on my way
up the company ladder since I am cutting cost
and making my boss look good.

Thanks! Good luck in all your future endeavors.

ECF No. 144-13, PageID # 2060.

On October 27, 2011, Jinadasa sent an e-mail to

Faustino and Schlag:

Hi! Boss:

Thank you for letter . . . dated October 27,
2011 letting me know that I was denied the
position of PeopleSoft Developer.  You have
till November 11th, 2011 to choose from the
following options and get back to me by 5pm
that day with your choice:

1. Revamp my position and include Portal
administration & Integration Broker and give
me the Salary I deserve.

2. Find another EIS employee to take on
Portal Administration & Monitoring
Integration Broker, which is not in my job
description and I took on to ensure that
services were not interrupted when Mindy left
in May of 2011.

Should you fail to respond by that date and
time, I will take every necessary step to
ensure that my family and I are being treated
fairly and receive the honest and fair
compensation that we deserve.  Look forward
to your reply.

ECF No. 144-14, PageID # 2061.  Jinadasa then immediately followed up with an e-mail stating, "Disregard the email . . . . I am done dealing with you.  Get ready for what is about to come in the next few weeks . . . ."  Id.

Norman Black began his employment with BYU-Hawaii on October 31, 2011, as its Enterprise Information Systems director.  See Decl. of Norman Black ¶ 2, ECF No. 132-2, PageID # 1544.

On November 15, 2011, Faustino, the Human Resources director at BYU-Hawaii, sent Jinadasa a letter that said:

> Dear JJ:
>
> We have received a number of email communications that you have sent to Kevin Schlag since initiating your claims with this office on August 25, 2011.  **In reviewing these emails, I have noted a disturbing trend in your communications to become increasingly threatening and confrontational with Kevin.**
>
> I want to remind you that you are still a university employee and as such, you have a continuing duty of loyalty to the university. Part of that duty includes alerting the university, through appropriate channels, to any unlawful actions or practices taking place at the university, including unlawful discrimination or retaliation.  We sincerely appreciate the good-faith efforts of our employees to report and help us eliminate any unlawful employment practices.  Moreover, federal law and university policy protect you against any act of retaliation that might be taken against you because of your reports or because of your participation in or support of any investigation of unlawful discrimination.  However, **the fact that you have filed discrimination claims against the university does not excuse you from any part of your employment duties, including your**

**duty to comply with the Honor Code and
policies of BYU-Hawaii.** Likewise, the
prohibitions against retaliation do not
exempt you from discipline for violations of
these university standards.

One of the requirements that applies to all
university employees is the personal
commitment we make in the Honor Code to
"respect others." This is particularly
important in the workplace where co-workers
need to coordinate their efforts and work
together under the direction of their
supervisor to accomplish university
objectives. One way in which a lack of
respect is manifest is by attributing flaws
of character or integrity to those who do not
agree with you. Many of your communications
since you filed your claim with this office
appear to violate this Honor Code standard.

It is not uncommon for university employees
to say or do things from time to time that do
not demonstrate appropriate respect for their
co-workers and supervisors. But the emails
you sent establish a pattern of
communications from you that appear to be
calculated to provoke an emotional reaction,
to threaten or intimidate, or to denigrate or
antagonize your co-workers and supervisors.
As such, they are inappropriate in the
workplace and counterproductive to our
conflict resolution efforts. I believe that
they are also in violation of the Honor
Code's requirement that employees of
BYU-Hawaii "respect others."

Even in a situation-or perhaps especially in
the situation-in which you feel that others
at the university have acted unethically or
unlawfully, your interactions and
communications with them should continue to
be professional and should not be unduly
disrespectful. Conflicts will arise in
any organization, and sometimes the people
involved in those conflicts will lose their
sense of personal respect for each other. At
BYU-Hawaii, however, this does not excuse

them from the Honor Code's requirement that they treat each other with respect.  The university has established processes designed to help resolve workplace conflicts and correct unlawful or unethical practices in an ordered and rational manner and in a forum where all parties are treated with respect. **Inflammatory communications, sarcastic comments, and accusations based on matters that are extraneous to your claim and the current investigation are not appropriate for this process, and are inconsistent with the Honor Code standard of showing respect for others.**

**The university cannot permit such communications to continue to disrupt the workplace.**  I have already asked you once to direct any questions or comments about your discrimination claims to Jeannie Lawrence in this office, and to limit your communications with Kevin to those day-today work-related matters that are part of your regular employment.  **Any further inappropriate communications will be subject to university discipline, and if you persist in such disrespectful communications, you may be subjected to further discipline, up to and including the termination of your employment.** If you need further clarification of this standard, I can provide you with a number of examples of disrespectful communications from your recent emails.  If you have questions about the appropriateness of communications you feel you need to make with Kevin or others, I would be happy to review your communications with you before they are sent to ensure that they are consistent with university standards set forth in the Honor Code.

I hope you will not misunderstand our intent in bringing these things to your attention. Our purpose is to remind you of this Honor Code standard, help you understand how some of your recent communications violate the standard, and alert you to the consequences

of further disregarding a standard that governs our behavior as employees of BYU-Hawaii.  However, I would not want you to understand this warning as discouraging, in any way, your reporting of discrimination or other actions in support of your claims of unlawful discrimination.  You are free to communicate--and encouraged to communicate-- information that you believe in good faith may be relevant to your claims of discrimination or any other unlawful practices that you observe taking place at BYU-Hawaii.  In fact, it is critical that the university receive this information so that we can identify and correct any such unlawful actions and practices.  As mentioned above, such communications are also subject to legal protections against retaliation, and university policy and federal law prohibit the university and your supervisors from exercising discipline against you or taking any materially adverse action against you on the basis of such reports.  But the inflammatory and disrespectful language you have included in recent emails is unnecessary to communicate your discrimination claims or to provide evidence in support of those claims. Threats, taunts, and insults are extraneous and impertinent to your claims, and the anti-retaliation laws and university policies do not immunize you from discipline for this kind of language.

I hope this information is helpful and that everyone involved will be able to maintain a respectful and professional attitude while our office sorts through the various allegations you have made.  Please let me know if you have any questions about our investigation that l can answer.

Sincerely,

Tessie Faustino

ECF No. 132-5, PageID #s 1727-29 (emphasis added).

Jinadasa appears to have commented on the letter of
November 15, 2011.  Although his comments are not in the record,
Faustino wrote to Jinadasa, referring to a request from him:

> I have attached a copy of the Honor Code, as
> you requested.  My main concern is that your
> emails show a pattern of communications that
> violate the Honor Code requirement to
> "Respect others."  While your communications
> have not been profane or discriminatory in
> nature, more is required of BYU-H employees
> than to refrain from swearing and from racial
> epithets.  Let me share a number of examples
> from emails you have recently sent, and try
> to explain why these communications may not
> meet the standards for employment at
> BYU-Hawaii:

ECF No. 132-5, PageID # 1730.  Faustino spent several pages
discussing comments Jinadasa had made that Faustino thought might
have violated the Honor Code.  Id., PageID #s 1730-32.  Faustino
then stated:

> These are some the most troubling examples of
> your disrespectful communications in recent
> weeks.  I recognize that other employees may
> say and do things that are inappropriate from
> time to time as well. . . .  In your case, it
> was necessary that I provide counsel and a
> warning because HR was aware of the situation
> (I had been copied on your emails), because
> we had already requested once that you do not
> discuss the discrimination claim with Kevin,
> and because the number and frequency of
> derogatory emails seems to indicate a pattern
> of disrespectful communication that is
> increasing in intensity.

Id., PageID # 1732.

On May 21, 2012, Jinadasa sent an e-mail to a
Dr. Clayton Hubner and Michelle Fuluvaka, who had apparently

24

complained about some kind of "outage" affecting the Canvas

Learning Management System that was used in a classroom.  See ECF

No. 132-5, PageID #s 1722-23.  Jinadasa told them that "Canvas

branding was not affected" because it was hosted on a different

server that had not crashed.  Jinadasa said that it was

"preposterous" for them to think that the crash of a different

server had affected the Canvas program.  Id.  Jinadasa further

told them, "Taking shots at Branding and the BYUH system is

uncalled for, we welcome constructive feedback and will continue

to work on improving services."  Id.

On May 22, 2012, Norman Black wrote a "Memo for

Record," stating to Jinadasa:

> I appreciate your desire to clarify things,
> but this email was unprofessional in that it
> accused Dr. Hubner and Michelle of not
> understanding the problems and called their
> comments preposterous and accused them of
> taking shots at the web systems.  You
> then told them their comments were uncalled
> for and that you only wanted constructive
> feedback.
>
> . . . . Your response to them was
> unwarranted and unnecessary.  From my visits,
> I understand this type of response has
> happened in the past and it needs to be
> handled more professionally going forward.
>
> In the future, please consider suggestions
> for what they are, simply suggestions.  You
> are doing a good job here.  I appreciate your
> contributions to the team.  Emails like the
> one above reflect negatively on you and on
> our team without providing anything positive.
> If you feel like you have been attacked or
> criticized, please come and talk with me and

25

> we will resolve it in a manner that will be
> acceptable to all involved.

ECF No. 132-5, PageID # 1723.

On September 23, 2012, Jinadasa sent an e-mail to the entire Enterprise Information Systems Department.  See Videotaped Deposition of Jinendra Jinadasa at 209, ECF No. 132-5, PageID # 1671.  This e-mail asked whether there was a "major typo" with a job posting that stated, "Will work in an office at LDS Business College in Salt Lake City, Utah" and "Required to travel to BYU-Hawaii Campus twice per year for a minimum of one-week stay for each trip."  Jinadasa's e-mail about the job posting said, "If this is not a typo and is accurate, I would love to know the brilliant mastermind behind this genius job posting."  ECF No. 132-5, PageID # 1733.  He then stated, "I have a bad feeling which in the past always becomes a reality that this job posting is being massaged for someone's friend or acquaintance down in Utah or some other Mormon ville.  I am just wondering what is next, out source EIS to India.  Thanks."  Id.

On October 12, 2012, Faustino sent a letter to Jinadasa that responded to his e-mail of September 23, 2012, as well as to other complaints by Jinadasa.  Faustino said, "[N]one of the allegations raised in your letter provides a basis for a finding that BYU-Hawaii or any of its employees has engaged in unlawful discrimination."  ECF No. 132-5, PageID # 1736-38.  Faustino's letter also stated:

26

> Our investigation of the allegations in your
> September 23, 2012 email not only found that
> no discrimination had taken place, but we
> determined that there is nothing in your
> email that even rises to the level of
> presenting a reasonable, good faith claim of
> discrimination.  It appears from our
> investigation that you have made these
> allegations without even a minimal inquiry
> into the facts or a cursory examination of
> the law, in spite of the fact that you have
> indicated that you have legal counsel that
> could advise you on these matters.  Moreover,
> this is the third time in seven months that
> you have raised discrimination claims against
> your colleagues or against the university
> based on speculation, rumor, or unsupported
> suspicions, but without any reasonable basis
> in law or in fact.

Id., PageID # 1738.

The letter went on to say that Jinadasa's "allegations appear to be designed to cause disruption in the work of your department, intimidate your co-workers, and harass your supervisors and this office with unfounded discrimination claims."  Faustino added:

> It has therefore become necessary to warn you
> that this kind of disruptive behavior is
> unacceptable at BYU-Hawaii.  Because this is
> your first warning about the filing of
> unreasonable and bad faith claims, I am not
> recommending at this time that any discipline
> should be imposed on you for this behavior.
> However, if you continue to seek to
> intimidate or harass your co-workers and
> supervisors with unreasonable or bad faith
> claims of discrimination or retaliation, you
> will be subject to university discipline.

Id.

27

Faustino concluded that Jinadasa had repeatedly sent disrespectful communications:

> This kind of disrespectful and unprofessional communication is part of a pattern of behavior that we have noted and warned you about in the past and that we have encouraged you to correct. (See my Nov. 15, 2011 letter and Nov. 16, 2011 email to you.) Unfortunately, as this pattern has re-emerged in your most recent email, I find it necessary to warn you again and to refer this matter to your supervisors for appropriate disciplinary action.  Accordingly, a copy of this letter will be sent to Norm Black with a recommendation that appropriate disciplinary measures be imposed on you.

Id., PageID # 1739.

Faustino appears to have been distinguishing between misconduct in the form of Jinadasa's allegedly baseless complaints and separate misconduct in the form of Jinadasa's allegedly disrespectful and unprofessional communications. Faustino was warning against repeating the former but not recommending discipline because this was the first warning to Jinadasa on that subject.  However, Faustino was forwarding on her concern about allegedly disrespectful communications for appropriate discipline, given the earlier counseling Jinadasa had received about such communications.

Later the same day, Black issued Jinadasa a letter of reprimand that suspended Jinadasa for 5 days, telling him that he was not to be on campus or at the office during the suspension. See ECF No. 132-5, PageID #s 1740-43.

28

This court need not here examine whether the suspension was the best and most appropriate way to address the alleged misconduct.  Instead, the court looks to Jinadasa's complaint that similarly situated employees were not similarly disciplined given their different race.  The circumstances relating to Schlag's counseling of Clark for her equating President Obama with "satan" and her use of an expletive are not comparable to Jinadasa's numerous e-mails.

Schlag began by counseling Jinadasa in much the same way he had counseled Clark.  Regardless of whether Clark's characterization of President Obama reflected a deep-seated racial animus, the record reflects that Clark quickly apologized. There is no evidence that she ever again made that or any analogous comment.  The single-word expletive similarly led to a quick apology, and once again there is no evidence the behavior was repeated.  By contrast, Jinadasa does not appear to have recognized the tone of his e-mails as inappropriate or to have moderated that tone.  In reacting to Jinadasa by suspending him, BYU-Hawaii cannot be said to have treated similarly situated employees differently.  Conduct repeated after counseling is not similar to one-time misconduct.  Accordingly, Jinadasa fails to establish a prima facie case of disparate treatment based on Clark's lesser punishment.

29

Nor is this court persuaded by Jinadasa's argument that there were other individuals at BYU-Hawaii who were not punished as severely as he was.  In Jinadasa's motion for summary judgment, for example, he says that he complained that a Caucasian male with a tattoo and another man with a beard were not punished for what Jinadasa says were Honor Code violations. Jinadasa also claimed that other employees viewed a video at work that made fun of African-Americans but were not disciplined. Even if his EEOC charge and the Fourth Amended Complaint could be read as encompassing these allegations, Jinadasa fails to demonstrate that these individuals were similarly situated.  This court cannot tell, for example, that the tattoo and beard were indeed Honor Code violations.  For all the court knows, the employees had the tattoo and beard when hired, the tattoo was an appropriate or customary cultural expression, or the beard was required by the employee's religion.  Nor does the court know whether the video was isolated or repeated.  Jinadasa raises no issue of fact as to whether these individuals allegedly violated the Honor Code over a long period of time or had received any prior warning about the matter in issue.

### C.   Jinadasa's Retaliation Claim Under Title VII.

Title VII's anti-retaliation provision generally forbids retaliation against an employee who has exercised rights under Title VII.  See 42 U.S.C. § 2000e-3(a).  "Title VII

30

retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

For purposes of a summary judgment motion, a plaintiff may demonstrate retaliation under Title VII by applying the McDonnell Douglas burden-shifting analysis. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).

To make out a prima facie retaliation claim under Title VII, a plaintiff must show that "(1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." Davis v. Team Elec. Co., 520 F.3d 1080, 1093–94 (9th Cir. 2008). The causal link must establish a "but for" connection. Nassar, 133 S. Ct. at 2533.

"Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices." Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003) (quotation marks and citation omitted); 42 U.S.C.

§ 2000e-3(a) (forbidding discrimination against employee who "opposed any unlawful employment practice prohibited by Title VII or who has made a charge, testified, assisted, or participated in a Title VII proceeding or investigation").  There is no dispute that Jinadasa's filing of his EEOC charges constitutes protected activity for purposes of his Title VII retaliation claim.

At the hearing on the present motion, Jinadasa initially indicated that he was limiting the protected activity underlying his retaliation claim to his filing of EEOC charges and to his notifications to BYU-Hawaii that he intended to file those charges.  The court deems that statement to encompass his internal notification of August 25, 2011, to BYU-Hawaii's Human Resources Department that he viewed certain matters as discriminatory.

Later in the hearing, Jinadasa mentioned that he was retaliated against for having opposed BYU-Hawaii's discrimination towards others in 2008.  Jinadasa indicated, for example, that he was denied training trips in 2009 and 2010 because he had opposed discrimination in 2008.  But Jinadasa did not administratively exhaust any such Title VII retaliation claim.  There is no contention that Jinadasa submitted a claim to the EEOC within 300 days of being denied travel.[1]  See ECF No. 121-3.  Jinadasa may

---

[1] A plaintiff must exhaust his or her administrative remedies before bringing a Title VII claim in this court.  Sommatino v. United States, 255 F.3d 704, 707 (9th Cir. 2001) ("In order to

not proceed with an unexhausted Title VII claim based on being denied training trips in 2009 and 2010 in retaliation for Jinadasa's opposition to alleged discriminatory practices in 2008.

For purposes of the second prong of the prima facie case of retaliation in violation of Title VII, an "adverse employment action" is an action that is "materially adverse" to a reasonable employee or job applicant. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted). An "adverse employment action" is one that "materially affects the compensation, terms, conditions, or privileges of employment." Davis, 520 F.3d at 1089. An "adverse employment action" exists when the employer's actions are so harmful that they could dissuade a reasonable worker from making or supporting a charge of discrimination. White, 548 U.S. at 68. Normally, "petty slights, minor annoyances, and simple lack of good manners" will not deter a reasonable worker from making a charge

---

bring a Title VII claim in district court, a plaintiff must first exhaust her administrative remedies"). A plaintiff does this by filing a charge with the EEOC within 180 days of the occurrence of the alleged unlawful practice. 42 U.S.C. § 2000e-5(e)(1). However, when a person also files a charge with a state or local agency, the EEOC charge must be filed within 300 days of the occurrence of the alleged unlawful practice. Id.; see EEOC v. Dinuba Med. Clinic, 222 F.3d 580, 585 (9th Cir. 2000) ("Although ordinarily the administrative charge must be filed within 180 days of the alleged unlawful employment practice, the deadline is extended to 300 days if the charge is initially filed with a state agency that enforces its own anti-discrimination laws.").

of discrimination, id., while termination, dissemination of a negative employment reference, issuance of an undeserved performance review, and refusal to consider a plaintiff for a promotion may.  See Brooks v. City of San Mateo, 229 F.3d 917, 928-29 (9th Cir. 2000).

The Ninth Circuit has adopted the EEOC's guidelines for what constitutes an adverse employment action in the Title VII context, ruling that an adverse employment action is any adverse treatment that "is reasonably likely to deter the charging party or others from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000); accord Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 965 (9th Cir. 2004). Thus, the Ninth Circuit defines "adverse employment actions" broadly, not limiting them to actions such as discharges, transfers, or demotions.  See Lyons v. England, 307 F.3d 1092, 1118 (9th Cir. 2002).  Adverse employment actions may include lateral transfers, unfavorable job references, and changes in work schedules, but not "every offensive utterance by co-workers" is an adverse employment action because "offensive statements by co-workers do not reasonably deter employees from engaging in protected activity." Ray, 217 F.3d at 1243.

With respect to the causation requirement in a prima facie case of retaliation, a court may infer causation when an adverse employment action occurs "fairly soon after the

34

employee's protected expression." See Villiarimo, 281 F.3d at 1065. "Causation sufficient to establish the . . . [causal link] element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

Under the McDonnell Douglas framework, once a plaintiff succeeds in presenting a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision. Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007). "Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination." Id.

There is no dispute that Jinadasa's filing of EEOC charges was protected activity for purposes of his Title VII retaliation claim. See ECF No. 131-1, PageID # 1512 ("BYUH does not dispute that Plaintiff engaged in protected activity by filing his EEOC charges."). The Fourth Amended Complaint asserts that, in retaliation for exercising Title VII rights Jinadasa was: (1) banned from the BYU Hawaii campus; (2) barred from attending a worship service; (3) barred from attending a family

35

wedding on the BYU Hawaii campus; (4) singled out for violation of BYU Hawaii policy while more severe violations by others were ignored; (5) given bad performance reviews; (6) denied training trips and awards; (7) yelled at; (8) left out of key decision making; and (9) not invited to parties.  The court examines each of these alleged adverse employment actions below.

### 1.    Jinadasa Does Not Show that the Ban From Campus, Which Kept Jinadasa From a Worship Service and Family Wedding, Was Caused By His Exercise of a Protected Right.

There is no dispute that Black's 5-day suspension of Jinadasa, which was accompanied by a ban on Jinadasa's presence on campus or at the office during the suspension, amounted to an adverse employment action.  The issue is rather whether that adverse employment action was caused by Jinadasa's exercise of a protected right.  If he presents no evidence of that "but for" relationship, Jinadasa does not show how he would establish a prima facie case at trial.

Jinadasa had submitted a complaint to the BYU-Hawaii Human Resources Department on August 25, 2011.  He then filed his first EEOC charge on October 5, 2011.  Both of these protected activities occurred more than a year before Black suspended him. Jinadasa relies entirely on temporal proximity to establish causation.  "A temporal distance of several months makes a causal link more difficult to prove; a distance of five years severely undermines it."  <u>Stucky v. Haw. Dept. of Educ.</u>, 2007 WL 602105,

*5 (D. Haw. Feb. 15, 2007).  Compare Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996) (4-month period between protected activity and layoff was sufficiently close to satisfy "causal link" prong), and Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (3-month period sufficient to infer causation), with Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th Cir. 2003) (no causal inference possible when 9 months separated protected activity from adverse employment action).

The Supreme Court observed in Clark County School District v. Breeden, 532 U.S. 268, 273 (2001), that the requisite "temporal proximity must be 'very close.'"  Breeden cites with approval cases from the Seventh and Tenth Circuits holding that 3- and 4-month periods do not support an inference of causation. Id.  More recently, the Ninth Circuit has cautioned courts against engaging in a "mechanical inquiry into the amount of time between the speech and alleged retaliatory action."  Anthoine v. N. Central Counties Consortium, 605 F.3d 740, 751 (9th Cir. 2010).  In short, there is no "bright line" rule providing that any particular period is always too long or always short enough to support an inference.  See Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003).  However, under the circumstances presented here, it is clear that the year between the suspension and the filing of the EEOC charge is too long a period to support an inference of causation.  Instead, the record

indicates that the suspension flowed from what BYU-Hawaii viewed as Jinadasa's disrespectful and increasingly hostile communications, which he had been warned about.

Even if Jinadasa could be said to have established a prima facie case, BYU-Hawaii would be entitled to summary judgment with respect to the portion of the Title VII retaliation claim based on the suspension and ban from campus, as BYU-Hawaii establishes a legitimate nondiscriminatory reason for its actions and Jinadasa fails to raise a genuine issue of fact as to pretext. BYU-Hawaii has demonstrated a legitmate, nondicriminatory reason for suspending Jinadasa and banning him from campus. Jinadasa had repeatedly sent e-mails to his coworkers, supervisors, and the Human Resources Department that BYU-Hawaii told Jinadasa were inappropriate. Jinadasa provides no evidence that BYU-Hawaii's explanation for the suspension and ban is pretextual. Jinadasa does not even attempt to identify evidence he might introduce at trial that would cast doubt on BYU-Hawaii's stated explanation. Under these circumstances, BYU-Hawaii is entitled to summary judgment to the extent Jinadasa bases his Title VII retaliation claim on his suspension and ban from campus.

**2.   Jinadasa Does Not Show That He Was Treated More Harshly Than Others For Similar Violations of the Honor Code.**

As discussed above, Jinadasa fails to establish the factual predicate for his claim that his Honor Code violations netted him harsher discipline than was imposed on similarly situated employees.  Accordingly, this provides no basis for a Title VII retaliation claim.

**3.   Jinadasa Does Not Show That He Got a Bad Performance Review Because He Had Exercised a Protected Right.**

Jinadasa claims to have received poor performance reviews in retaliation for his discrimination complaints.  BYU-Hawaii begins by arguing that Jinadasa has admitted that he did not receive poor performance reviews.  For example, in his motion for summary judgment, Jinadasa states, "From 2007 to the present day, the plaintiff has received over average performance reviews."  ECF No. 115, PageID # 1225.  Exhibit 23 to Jinadasa's deposition is a copy of his 2012 performance evaluation by Black.  ECF No. 132-5, PageID #s 1718-20.  Jinadasa characterized this review as "an above average performance review."  Jinadasa Depo. at 103-04, ECF No. 132-5, PageID #s 1594-95.

This court does not think Jinadasa's statements about getting good reviews negate his claim.  A review that on the whole may have been above average is not inconsistent with a retaliation claim.  In an evaluation by Kevin Schlag dated

39

October 18, 2011, which was about 2 weeks after Jinadasa's first EEOC charge of October 5, 2011, Jinadasa received mostly ratings of "3" (solid achiever), with one "4" (high achiever) and one "2" (fair performer).  See ECF No, 132-5, PageID # 1715.  Jinadasa received a "2" for his "communication skills" with the explanation: "Sometimes JJ responds without gathering all the information first, and sometimes he doesn't follow the organizational lines of communication.  I will not consider any communications made in the context of JJ's discrimination claim in this evaluation."  Id.

Kevin Schlag's October 2011 rating of "2" for Jinadasa's "communication skills" is not sufficient to defeat summary judgment because Jinadasa raises no genuine issue of fact as to whether the review was undeserved.  The court notes that the "2" Jinadasa received for "communication skills" in his 2011 performance review is the same rating he had received from Schlag in his 2009 and 2010 performance reviews, before he had filed any discrimination complaint in issue here.  See ECF No. 132-5, PageID #s 1702 and 1706.  The comments for the 2010 rating state, "Typically does well--sometimes is not up to standards of professional business communication."  Id., PageID # 1706.  The comments section for the 2009 rating simply stated, "Be professional in all communications."  Id., PageID # 1702.  In the month before the 2011 performance review, Jinadasa sent the Human

Resources Department and Schlag e-mails stating, "How ignorant and reckless could you and the administration be?"  Jinadasa also complained in e-mail that Schlag had berated Jinadasa for his "communication skills because I never kiss up to him and the rest of the administration."  ECF No. 144-9, PageID # 2055; ECF No. 144-12, PageID # 2059.  Although the substance of these e-mails may have been protected because they related to Jinadasa's EEOC filing, Jinadasa has not presented a triable issue going to why BYU-Hawaii's concern about the tone of the e-mails was anything but a legitimate nondiscriminatory reason for giving Jinadasa a "2" for communication skills.

BYU-Hawaii has demonstrated a legitimate nondiscriminatory reason for the rating.  Because Jinadasa does not raise a genuine issue of fact as to whether the rating was a pretext for discrimination or retaliation, BYU-Hawaii is entitled to partial summary judgment to the extent Jinadasa's Title VII retaliation claim is based on the 2011 performance review that gave Jinadasa a "2" for communication skills.

On or about November 2, 2012, Jinadasa's new supervisor, Norman Black, issued Jinadasa's performance review for 2012.  This review rated Jinadasa "3" or "4" in all categories but "communication skills."  Black rated Jinadasa a "1" for "communication skills," explaining, "Received counseling and was disciplined for inappropriate communications."  ECF No.

41

132-5, PageID # 1718.  As discussed above, Jinadasa was suspended

by Black on or about October 12, 2012, just a few weeks before

the performance review was issued.  ECF No. 132-5, PageID

#s 1742-43.  Before that suspension, Jinadasa had sent, on

September 23, 2012, an e-mail that sarcastically asked who was

"the brilliant mastermind behind this genius job posting."  ECFR

No. 132-5, PageID # 1733.  As with the 2011 performance review,

Jinadasa's communications provided BYU-Hawaii with a legitimate

nondiscriminatory reason for the rating he received for

"communication skills" on his 2012 annual performance review.

Because Jinadasa does not raise a genuine issue of fact as to

whether the stated reason is a pretext for discrimination or

retaliation, BYU-Hawaii is entitled to partial summary judgment

with respect to the portion of the Title VII retaliation claim

based on the 2012 performance review.

### 4. Jinadasa Does Not Show That His Discrimination Complaints Were the "But For" Reason He Was Denied Training Trips.

Jinadasa next claims that he was retaliated against in

violation of Title VII when he was denied training trips in 2009

or 2010.  But because the training trips occurred before Jinadasa

complained about discrimination in 2011 to the Human Resources

Department or filed charges with the EEOC in 2011, the denial of

approval for Jinadasa to attend the conferences could not have

been in retaliation for that protected activity.

Jinadasa testified that he asked Schlag if he could attend a Drupal conference in New York or Washington in either 2009 or 2010.  Jinadasa explained in his deposition that Schlag said that Jinadasa could not attend the conference because the budget had already been spent.  See Jinadasa Depo. at 139, ECF No. 132-5, PageID # 1614.  Because the denial of the training trips preceded the submission of the 2011 complaint to the Human Resources Department and the EEOC charges, that denial cannot possibly have been in retaliation for that protected activity.

At the hearing on the present motions, Jinadasa indicated that he was denied training trips in 2009 and 2010 in retaliation for having opposed discriminatory practices in 2008. As noted above, however, Jinadasa did not timely exhaust his administrative remedies with respect to such a retaliation claim. That is, he filed no EEOC charge within 300 days of the denial in 2009 or 2010.

> ### 5. Jinadasa Does Not Show That He Was Denied Any Awards in Retaliation For His Discrimination Complaints.

Jinadasa says he was denied a monetary award in 2012. He explained that he had been nominated for an award by a department manager.  See Jinadasa Depo. at 135-36, ECF No. 132-5, PageID # 1611-12.  Jinadasa said that, in the end, BYU-Hawaii gave the award to someone else based on "Favoritism,

discrimination, nepotism, whatever you call it." <u>Id.</u> at 138, PageID # 1613.

This court notes that favoritism might not relate to any matter covered by Title VII.  While it might not make sense to hand out purportedly merit-based awards to people just because one likes them, one might like them for reasons unrelated to race.  Not all forms of discrimination are prohibited by Title VII.  This court nevertheless assumes for purposes of this order that Jinadasa is asserting that the giving of the award involved race discrimination.

Norman Black explains that the award at issue, the Exemplary Employee Award, "recognizes employees for excellent work and exemplifying BYUH's mission, purpose, and initiatives." Decl. of Norman Black ¶ 9, ECF No. 132-2, PageID # 1546.  Black says that, at the time of Jinadasa's nomination for the award in 2012, Jinadasa had already displayed his pattern of disrespectful conduct toward his supervisors and coworkers.  <u>Id.</u>  ¶ 10.

Jinadasa presents no evidence suggesting that his failure to receive the award was caused by his discrimination complaints.  It is not even clear that the giving of the award to someone else amounts to an adverse employment action, as the giving of a discretionary award to someone else might not be "reasonably likely to deter the charging party or others from engaging in protected activity." <u>Ray</u>, 217 F.3d at 1242-43.  But

even if not receiving a discretionary award could be considered an adverse employment action, Jinadasa fails to raise an issue of fact as to whether the award should have instead been given to him.  Jinadasa does not dispute that he sent his supervisors, coworkers, and the Human Resources Department a series of e-mails that he was told were inappropriate.  This might have disqualified him from receiving an award for "excellent work and exemplifying BYUH's mission, purpose, and initiatives."

This court fully understands that discretionary acts like awards may well be fertile ground for discrimination that perpetrators may think will go undetected.  The discretionary nature of an award does not remove it from scrutiny, especially when, like here, the award also comes with money.  At the same time, a claimant cannot escape his proof obligations by simply saying, "I should have been chosen."  Here, multiple people were nominated for the award, and Jinadasa must show not only that retaliation was in play but also that, but for that discrimination, he would have been chosen.  See Nasser, 133 S. Ct. at 2533.  Jinadasa makes no such showing.

Jinadasa essentially attempts to establish pretext by arguing that Mindy Clark received the award in 2008.  Jinadasa says she was undeserving of the award then because she had been counseled for calling President Obama "satan" and for using the word "shit."  See Decl. of Kevin Schlag ¶¶ 22-23, ECF No. 132-1,

PageID # 1542.  The record contains no evidence that the award was given to Clark after she was counseled.  What is clear is that Clark's counseling for saying "shit" occurred in 2009 and that she said "satan" in November 2008, after the election.  Nor is there any evidence of other nominees in 2008, some of whom might have been counseled for worse offenses.  On the present record, this court cannot infer retaliatory discrimination on the basis of unequal treatment of similarly situated individuals.

### 6.    Jinadasa Does Not Present Evidence That Schlag Yelled At Him In Retaliation For Any Discrimination Complaint.

Jinadasa testified that Schlag "snapped" or yelled at him on September 28, 2009.  Schlag apologized the next day.  See Jinadasa Depo. at 114, ECF No. 132-5, PageID # 1599; 132-5, PageID # 1721 (copy of e-mail chain).  Jinadasa says this outburst supports his retaliation claim.  See Jinadasa Depo. at 87, ECF No. 132-5, PageID # 1578.  However, this event occurred several years before Jinadasa's 2011 discrimination complaints.  See ECF No. 121-3.  Jinadasa's protected activity in 2011 therefore could not have been the "but for" cause of Schlag's outburst.

>          7.   **Jinadasa Does Not Present Evidence That Any
>               Job Responsibility Changes Were in
>               Retaliation for Any Discrimination Complaint.**

Jinadasa says he was retaliated against for having submitted discrimination complaints when he was left out of key decision making.

Jinadasa filed his first EEOC charge on October 5, 2011.  See ECF No. 121-3, PageID # 1416.  Jinadasa was suspended for 5 days, as discussed above, on October 12, 2012.  See ECF No. 132-5, PageID #s 1740-43.  Jinadasa filed his second EEOC charge on November 8, 2012, complaining about his suspension.  See ECF No. 121-4, PageID #s 1418-19.

Jinadasa says that, after his suspension, he suffered a series of changes in his work.  He says that, before his suspension, he could access the Domain Name System server. Jinadasa claims that, after his suspension, he lost that access. He then had to wait months to address some requests that, before the job changes, he could have easily addressed.  See Jinadasa Depo. at 150-51, ECF No. 132-5, PageID # 1623-24.  Jinadasa says that affected his job.  Id. at 153, PageID # 1625.  He also says that some of the projects he had been working on were transferred to others.  Id. at 156, PageID # 1628.  He explains that "ownership of the face of the University on the internet to the public went from the IT group EIS to University communications." Id., PageID # 1635.

47

Jinadasa's supervisor, Black, indicates that Jinadasa lost control over the servers when he transferred to a different department in April 2013, while the administration of the web servers stayed in Jinadasa's old department.  See Black Decl. ¶ 12, ECF No. 132-2, PageID # 1546.  At the hearing on the present motions, Jinadasa said that he was not complaining about being transferred from the IT group EIS to University Communications in April 2013.

Black also says he decided to change project administration based on workload and operational needs.  See Black Decl. ¶ 15, ECF No. 132-2, PageID # 1547.  BYU-Hawaii thus presents legitimate, nondiscriminatory reasons for its actions. The burden shifts to Jinadasa to raise a genuine issue of fact as to whether the proffered reasons are a pretext for discrimination.  Because Jinadasa does not meet that burden. BYU-Hawaii is entitled to summary judgment with respect to the portion of the Title VII retaliation claims based on alleged changes in Jinadasa's job.

8.  **Jinadasa Presents No Evidence That BYU-Hawaii Retaliated Against Him By Not Inviting Him to Parties.**

Jinadasa contends that, having complained about discrimination, he was excluded from parties in retaliation. However, Jinadasa presents no evidence that the parties in issue were sponsored by BYU-Hawaii (as opposed to organized by

48

employees as private social events).   Nor does he show that he
would have been invited but for his discrimination complaints.
See Nasser, 133 S. Ct. at 2533 (requiring "but for" causation).
The Ninth Circuit has held that ostracism by other employees is
not an adverse employment action for purposes of Title VII
retaliation claims.   See Brooks v. City of San Mateo, 229 F.3d
917, 929 (9th Cir. 2000) (stating with respect to Title VII
retaliation claim, "Because an employer cannot force employees to
socialize with one another, ostracism suffered at the hands of
coworkers cannot constitute an adverse employment action."); see
also Cooper v. S. Cal. Edison Co., 170 F. App'x 496, 498 (9th
Cir. 2006).   Accordingly, BYU-Hawaii is granted partial summary
judgment with respect to the portion of the Title VII retaliation
claims based on Jinadasa's not having been invited to parties.

## V.        CONCLUSION.

Because Jinadasa has withdrawn his gender
discrimination claims with prejudice, the court denies as moot
BYU-Hawaii's motion for partial summary judgment with respect to
those claims.   However, with respect to the remaining claims, the
court grants summary judgment to BYU-Hawaii and denies Jinadasa's
motion for summary judgment.   Because this order leaves no claims
for further adjudication, the trial date and all deadlines and/or
court dates are vacated.

At the hearing on the motions disposed of by this order, Jinadasa indicated that he was considering leaving employment with BYU-Hawaii.  That suggests that any settlement might be achieved by a monetary sum.  This court will delay the entry of judgment to allow the parties to conduct a settlement conference with Magistrate Judge Kenneth J. Mansfield on November 17, 2016, at 10:30 a.m.  <u>Ex parte</u> sealed settlement statements shall be delivered to Magistrate Judge Mansfield no later than November 14, 2016.  These should not be filed with the Clerk of Court.

The court will enter judgment on or after December 1, 2016, or upon notification from Magistrate Judge Mansfield that judgment should be entered, whichever is earlier.  If it appears that settlement is a possibility, this court will further delay the entry of judgment to allow the settlement process to continue.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, November 9, 2016.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

<u>Jinadasa v. Brigham Young University-Hawaii, et al.</u>, Civ. No. 14-00441 SOM/BMK; ORDER GRANTING WITH RESPECT TO RACE DISCRIMINATION CLAIMS AND DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT WITH RESPECT TO WITHDRAWN SEX DISCRIMINATION CLAIM; ORDER DENYING PLAINTIFF JINENDRA JINADASA'S MOTION FOR SUMMARY JUDGMENT